# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 5, 2008

## STATE OF TENNESSEE v. LARRY FRANK and SHURROD TOWNS

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 04-01201, 04-01202    Carolyn Wade Blackett, Judge**

---

**No. W2007-00446-CCA-R3-CD   -   Filed April 24, 2009**

---

A Shelby County Criminal Court jury convicted the appellants, Larry Frank and Shurrod Towns, of attempted first degree premeditated murder in case number 04-01201 and first degree premeditated murder and four counts of attempted first degree premeditated murder in case number 04-01202. The trial court imposed life sentences for their murder convictions and twenty years for each attempted murder conviction, with the sentences to be served concurrently. On appeal,[1] Frank contends that the evidence is insufficient to support his convictions and that the trial court improperly imposed five-hundred-dollar fines. Towns argues that the evidence is insufficient to support his convictions, that the trial court should have dismissed the indictments because he was denied his right to a preliminary hearing, that the trial court should have declared a mistrial when a State witness testified that Towns had an arrest record, and that the trial court should have granted his motion for a new trial based upon newly discovered evidence. Based upon the record and the parties' briefs, we conclude that the trial court improperly fined both appellants. However, the judgments of the trial court are affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part and Modified in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Garland Ergüden (on appeal) and Tim Albers (at trial), Memphis, Tennessee, for the appellant, Larry Frank.

C. Michael Robbins (on appeal), Covington, Tennessee, and Howard Wagerman (at trial), Memphis, Tennessee, for the appellant, Shurrod Towns.

---

[1]This court granted the appellants' motion to consolidate their appeals.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Karen Cook, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual Background

This case arose from the death of Alandro Shinault, the attempted murder of the four passengers in his car, and the attempted murder of Jamie Neely. The appellants were tried jointly.

Karen Kelly testified that on September 27, 2003, she lived on Airview Road in Shelby County and had a party at her home in order to raise money for the Westwood High School Athletic Department. The party was in Kelly's back yard, and students from the high school were invited. Alandro Shinault and Jamie Neely attended the party. At some point, Kelly closed down the party because "[a] few people . . . was getting rowdy."

On cross-examination, Kelly testified that she, two other parents, several teachers, and a coach monitored the party. She acknowledged that some party attendees were older and no longer attended high school. The party started at 8:00 p.m., and Kelly closed the party about 9:30 p.m. because she saw some of the students "throwing up [their] sets," i.e., showing their gang signs. Kelly's husband escorted the group of students "keeping the trouble up" out of the back yard. Andrew Perkins and some other boys came to the party with Alandro Shinault. Although Shinault's group was not involved in the trouble and Kelly did not ask them to leave, Shinault's group left when Kelly ended the party.

Ronald Kelly, Karen Kelly's husband, testified that on September 27, 2003, Alandro Shinault and Jamie Neely attended the party at his home. At some point, a disturbance occurred, and Karen Kelly asked a group of attendees to leave. As the group was leaving, one boy hit the Kellys' godson, Miguel Johnson, on the back of the head. The group, which included Towns, then got into five or six cars and drove toward Third Street.

On cross-examination, Ronald Kelly testified that Johnson was talking with Towns when the unidentified boy hit Johnson on the head. Jamie Neely had already left the party when Johnson was hit. Sometime after Karen Kelly closed the party and everyone left, Neely returned to the Kelly home and said he had been "jumped" at the nearby Mapco convenience store. The Kellys told Neely to stay at their house, but he was angry and left.

Twenty-two-year-old Miguel Johnson testified that he attended Karen Kelly's fundraiser on September 27 and that two groups of people started yelling at each other. Johnson thought the yelling could develop into an altercation and told everyone to calm down. Shortly thereafter, Karen Kelly announced the party was over, and she told a group of "kids" to leave. As the group was leaving, Johnson talked with Towns. Their conversation was calm, and they did not argue. While they were talking, a boy hit Johnson on the back of the head and ran. Ronald Kelly chased the boy

but could not catch him. While the group of students in the front yard was preparing to leave, Jamie Neely left in his purple Oldsmobile Cutlass. Five to ten minutes later, Neely returned to the Kellys' home. His shirt was torn, his face was red, and he was angry. Neely said he had been "jumped on" and left the Kellys' home again. On cross-examination, Johnson said Neely did not say anything about a shooting.

Nineteen-year-old Marchello Kuykendall testified that he and Alandro Shinault went to the party at the Kellys' home. Antuan Todd, Princeton Smith, and Andrew Perkins went with them, and Shinault drove them to the party in his blue Buick. They arrived about 9:15 p.m. and stayed about twenty minutes. Two groups were at the party, one group wearing red and the other group wearing blue. Kuykendall was not part of either group. At some point, Karen Kelly tried to break up a disturbance and told the group dressed in red to leave. Kuykendall, Shinault, and the three boys with them decided to leave as well, and they got into Shinault's car. A green Ford Taurus was parked in front of them. When Shinault turned on the Buick, the car's headlights shined on the Taurus. Towns walked from the Taurus to the Buick and asked Andrew Perkins, who was sitting in the passenger seat behind Shinault, if he had a problem with "The Bloods" and said he would "smack the mess out of one of [you] young guys." Someone from Towns' group told Towns to leave the boys in the Buick alone, and Towns walked back to the Taurus. Shinault then drove away from the Kelly home toward Third Street.

Kuykendall testified that when Shinault stopped at the intersection of Airview Road and Third Street, the Taurus pulled up on the driver's side of the Buick. Towns, who was sitting in the Taurus' front passenger seat, got out and acted like he was going to open one of the Buick's doors. The Buick turned right onto Third Street and then turned right onto Holmes Road. The Taurus sped up, passed the Buick, and blocked the Buick at the intersection of Holmes and Tully Roads, forcing Shinault to turn left onto Tully Road. The Taurus' driver and passenger jumped out of the vehicle, and they had guns in their hands. Kuykendall told everyone to "duck," and shots were fired. Shinault was struck by a bullet, the Buick flipped over, and everyone but Shinault crawled out of the car's back window, which had been broken out. The Taurus drove by, and everyone laid on the ground while the Taurus passed. Afterward, they ran to a nearby store for help. Kuykendall stated that no one in the Buick had a weapon or shot at the Taurus.

On cross-examination, Kuykendall testified that four or five people were in the Taurus but that he did not see the driver. When the Taurus blocked the Buick at Holmes and Tully Roads, Kuykendall saw Towns and a tall person get out of the Taurus. Kuykendall stated that prior to September 27, he had never met Towns. He acknowledged that he gave a statement to the police on September 28, 2003. He said he may have looked at some photographs; however, he acknowledged that he was unable to identify anyone involved in the shooting.

Twenty-one-year-old Jamie Neely testified that he attended the party on September 27. When Karen Kelly shut down the party, Neely drove to his girlfriend's house on Ledbetter Avenue. As he was walking toward her front door, five people, including the appellants, got out of a green Taurus and assaulted him. After the assault, Neely returned to the Kellys' home. He stayed for five to ten minutes and returned to his girlfriend's house. Neely and his girlfriend then drove to a house

off Double Tree Road so that his girlfriend could pick up some clothes. Neely turned onto a street off Double Tree and saw the appellants get out of the green Taurus and shoot at him. A bullet struck his purple Cutlass on the driver's door, and the car's driver and passenger windows were shot out. Bullet holes also were found in the back of the Cutlass. Neely said he did not have a gun and did not shoot at the appellants. He acknowledged that he gave a statement to police on September 29, 2003, and that he picked out the appellants' photographs from photographic arrays.

On cross-examination, Neely testified that boys dressed in red at the party, including the appellants, were members of the Bloods gang and that boys dressed in blue were members of the Crips. Both groups were "throwing up" gang signs, and Karen Kelly told everyone to leave. As Neely was driving away from the Kelly home, he saw someone hit Miguel Johnson on the back of the head. Neely drove to the Mapco to buy gasoline, and a beige Cutlass with a blue top pulled into the parking lot. All of the people in the Cutlass were wearing red clothes. They got out of the beige Cutlass and ran toward Neely, and Neely drove away. As Neely was driving out of the parking lot, he saw a green Taurus turn right from Airview Road. The Taurus and the beige Cutlass began chasing his car. Neely drove to his girlfriend's house on Ledbetter Avenue and tried to get inside. However, five people got out of the Taurus and beat him. He said that two of his assailants were the appellants and that he did not know the other three. They beat Neely for about ten minutes until his girlfriend's grandmother came outside. She saw the Taurus' license tag number and said she was going to call the police. The five males got back into the Taurus and drove away. Neely returned to the Kelly home and told Miguel Johnson what had happened. Neely stated that after he left the Kellys' house, he drove his girlfriend to Double Tree Road. Neely saw Frank driving the Taurus and saw Towns sitting in the front passenger seat. Frank jumped out of the Taurus and started shooting at Neely's car. After the shooting, Neely spoke with the police. He told the police that his girlfriend was not with him during the shooting on Double Tree Road. However, he testified at trial that she was with him and that he lied to the police because his girlfriend did not want to get involved.

Princeton Smith testified that he went to Karen Kelly's fundraiser on September 27 with Alandro Shinault, Antuan Todd, Marchello Kuykendall, and Andrew Perkins. They stayed about thirty minutes and left when Kelly ended the party because "a group of people [got] into it arguing." The five boys got into Shinault's car. Towns walked to the driver's side of Shinault's car and asked, "[Y]a'll got a problem with Bloods?" Shinault told Towns that "everything cool," and one of Towns' friends pulled Towns away from Shinault's car. Shinault drove away and stopped at the intersection of Airview Road and Third Street. The Taurus also stopped at the intersection, and Towns, who was sitting in the front passenger seat, got out. Shinault pulled away from the intersection quickly, turned right onto Third Street, and turned right onto Holmes Road. The Taurus passed Shinault's Buick and forced Shinault to turn left onto Tully Road. Smith looked back, saw all the doors on the Taurus open, and saw everyone in the Taurus get out. He heard gunshots and saw the Buick slide onto its side. Smith did not see anyone from the Taurus with a weapon because he ducked down. He said that Frank was driving the Taurus and that he had seen Frank at Karen Kelly's party.

On cross-examination, Smith testified that he gave a statement to the police after the shooting in which he described the driver of the Taurus as seventeen to nineteen years old, wearing a white

t-shirt and a red hat, and having "four golds in his mouth." At trial, he said that his statement to police was incorrect and that appellant Towns, not the driver of the Taurus, had been wearing the white shirt and red hat on the night of September 27. He also said at trial that Frank was wearing a black and red Michael Vick football jersey on the night of the crimes. Smith acknowledged that the police showed him a photographic array after the shooting. He said he did not pick out Towns' photograph because he "wasn't sure."

Twenty-three-year-old Antuan Todd and nineteen-year-old Andrew Perkins gave testimony similar to Kuykendall and Smith. Todd also testified that he was sitting in the front passenger seat of Shinault's Buick after the party, that he could not see the face of the male who approached Shinault's car, and that the male was wearing a red and white shirt. Perkins testified that Towns approached Shinault's car after the party. Perkins also stated that after the shooting, he identified Towns' photograph from a photographic array. On cross-examination, Perkins acknowledged that although he identified Towns' photograph, he did not give the police Towns' name. However, he named other people who had participated in the shooting, including Rodrigues Richardson. Perkins told the police that he went to school with the shooter, and Perkins acknowledged at trial that he and Rodrigues attended school together.

Officer Marcus Redd of the Memphis Police Department testified that about 11:30 p.m. on September 27, 2003, he was dispatched to Tully Road. He saw an overturned blue Buick LeSabre in a ditch. The fire department was present and told him a fatality was still in the car. After the fire department removed Alandro Shinault from the Buick, Officer Redd saw a gunshot wound to the back of Shinault's head. On cross-examination, Officer Redd testified that he secured the scene and found bullet casings.

Dr. Karen Chancellor, the Shelby County Medical Examiner, testified that she did not perform Alandro Shinault's autopsy but reviewed his autopsy report. Shinault died of a gunshot wound to the head. The bullet entered the back of his head on the left side and traveled left to right and back to front. The bullet damaged both sides of his brain, causing his death. The bullet was recovered from Shinault's head, and no drugs or alcohol were found in his body.

On cross-examination, Dr. Chancellor testified that no soot or stippling was around the gunshot wound. Therefore, she concluded that the end of the gun barrel was not against Shinault's skin when it was fired and that the barrel was not very close to the body. Dr. Chancellor could not say how far away the gun was from Shinault when it was fired. However, she stated that the gun was no closer than four to six inches away.

Sergeant William D. Merritt of the Memphis Police Department testified that he interviewed Andrew Perkins about 3:30 a.m. on September 28. From the interview, Sergeant Merritt learned the nicknames of potential suspects. A co-worker later told Sergeant Merritt that the real name of one of the suspects was Shurrod Towns. Sergeant Merritt put together a photographic array containing Towns' photograph. He showed the array to Perkins, and Perkins "made the identification." On cross-examination, Sergeant Merritt testified that he asked Perkins to name the people in the Taurus. Perkins told Sergeant Merritt, "Stuffy or Little Bit. They are twins. The short dude whose brother

name is Resheeda and Rodrigues."

Sergeant Joseph Anthony Benya of the Memphis Police Department testified that he went to the scene of Alandro Shinault's shooting. He also went to Karen and Ronald Kelly's home. There, he was advised about another altercation involving Jamie Neely. Sergeant Benya went to Neely's house and saw a purple Cutlass. The passenger door window had been shot out, and a bullet hole was in one of the car's doors. Sergeant Benya saw another bullet hole between the driver's side window and the "opera window." Two additional bullet holes were in the rear window. Sergeant Benya spoke with Neely, and Larry Frank and Shurrod Towns became suspects.

Officer Gerald Paige of the Memphis Police Department testified that he was dispatched to the intersection of Holmes and Tully on September 27. When he arrived, Alandro Shinault was lying on his back behind a car. Officer Paige found seven .380 caliber shell casings on the side of the road. Later, he and Officer Marlon Wright investigated a second crime involving a purple car. Two bullet holes were in the purple car's rear window, a bullet hole was in the driver's door, and a bullet hole was in the right side passenger door.

Don Carpenter of the Memphis Police Department testified that he inventoried Jamie Neely's purple Oldsmobile Cutlass and found two bullets inside the car. He also processed the Cutlass, the Taurus, and the Buick for fingerprints. He "lifted" prints from the cars and turned the prints over to police officers.

Sergeant John Pasley of the Memphis Police Department testified that he investigated Alandro Shinault's homicide. On September 28, he went to Frank's home to locate the car involved, a green Ford Taurus. Neither Frank nor the car were there, so Sergeant Pasley returned to the home the next day. Sergeant Pasley spoke with Frank, and Frank showed him new damage to the Taurus. The car had a bullet hole in the windshield, a bullet hole near the license plate, and a scrape on the passenger side.

Sergeant L.W. Collins of the Memphis Police Department testified that on September 30, 2003, he went to the Double Tree Road area to locate a possible crime scene. He did not find any shell casings, bullet fragments, or blood droppings.

Sergeant T.J. Helldorfer of the Memphis Police Department testified that he was the case coordinator. As a result of Sergeant Helldorfer's investigation, the appellants became suspects. Sergeant Helldorfer put together a photographic array containing Towns' photograph, and Towns was positively identified. Sergeant Helldorfer said that after Towns was identified, the information was forwarded to the Gang Task Force so it could help with "the pickup attempts." Sergeant Helldorfer testified that despite repeated efforts, Towns could not be located, so a warrant was issued. The police arrested Towns on February 26, 2004.

Sergeant Helldorfer testified that he found Frank at Frank's home on September 29, 2003. The green Taurus was present, and Frank's mother pointed out new damage to the car, including bullet holes and scrapings. The car was towed to the police department for processing, and Frank

and his family came to the homicide office.

Sergeant Helldorfer testified that he interviewed Frank. During the interview, Frank stated the following: On September 27, 2003, he drove his mother's green Ford Taurus to a party. "Lil' Buck" went with Frank. After the party, Frank pulled up to a stop sign at Airview Road and Third Street. Frank saw a blue "little bitty" car with four or five males inside, and "[b]oth cars exchanged words." The blue car swerved toward Frank's car twice and slowed down. Frank stopped his car, and the males in the blue car shot through his windshield. Frank ducked and was scared. He drove Lil' Buck to Lil' Buck's grandmother's house and then drove to his uncle's home because he was "scared they were going to kill him." Frank said that he was not a member of a gang but that he used to be a Vice Lord. He stated that he was not involved in another shooting that occurred about forty-five minutes later on Double Tree Road. However, he said that on the way home, he saw a young male driving a long blue car and "we did beat the breaks off of him." Sergeant Helldorfer asked Frank what "beat the breaks off of him" meant, and Frank explained that it meant they beat up the male. Frank also told Sergeant Helldorfer that on the night of the party, he was wearing a red jersey with the number seven on it and the name "Vick" on the back.

On cross-examination, Sergeant Helldorfer testified that Frank cooperated with the police. The police found no evidence in the Taurus, and the only fingerprints recovered from the car belonged to Frank's mother. The police tried to find "Lil' Buck," but no one would identify him. Regarding Towns, Sergeant Helldorfer testified that Andrew Perkins was the only person who picked Towns' photograph out of a photographic array. Sergeant Helldorfer did not try to obtain a search warrant for Towns' home because he did not have enough information for a warrant.

Teri Arney from the Tennessee Bureau of Investigation (TBI) testified as a firearms identification expert that she received three fired bullets and seven cartridge cases for analysis. One of the bullets she examined was the bullet removed from Alandro Shinault's head. The bullet was consistent with a .380 caliber bullet but also could have been fired from a .9 millimeter gun. The remaining two bullets were recovered from Jamie Neely's Cutlass and also were consistent with being .380 caliber bullets. Arney microscopically compared all three bullets, and all three had the same rifling pattern and the same microscopic fingerprint. As a result, Arney concluded that the three bullets were fired from the same gun. Markings on the seven spent cartridge cases revealed they also were fired from the same gun. However, Arney could not determine if the bullets and the cases were fired from the same weapon because she did not have the weapon for comparison.

Officer Leonard Rogers of the Memphis Police Department testified that he arrested Towns on February 26, 2004. He described Towns as "stocky" but said Towns appeared slimmer at trial than he did at the time of his arrest. On cross-examination, Officer Rogers testified that Towns was peaceful, quiet, and did not give him any trouble.

Pamela Frank, Frank's mother, testified on his behalf that she owned a 1999 green Ford Taurus. On September 27, 2003, the Taurus was in good condition and its windshield was not

broken. Pamela[2] went out of town that weekend, left the Taurus at home, and gave the keys to her daughter. When she saw the car three days later, the windshield had been shot out, and a bullet hole was in the license tag and the driver's door. On cross-examination, Pamela acknowledged that she did not know when the damage occurred or her son's whereabouts while she was out of town.

Sergeant William D. Merritt testified for Towns that he assembled a photographic array containing Towns' photograph and that he showed the array to Marchello Kuykendall. Kuykendall was unable to make a positive identification.

Twenty-four-year-old Phillip "Big Phil" Jordan testified for Towns that in September 2003, Towns lived with his grandmother, Leola Towns, in the house across the street from Phillip's cousin. On September 27, 2003, Phillip went to the fundraiser at Karen Kelly's home with Towns and Towns' brother, Shjuan Thomason. Shjuan drove them to the party in his cream-colored Cutlass. Larry Frank also went to the party and drove to Karen Kelly's home in his green Taurus. Two other males rode to the party with Frank, but Phillip did not know them.

Phillip testified that after they had been at the party for about twenty or thirty minutes, an altercation occurred, and the homeowners told everyone the party was over. Towns walked over to Frank's green Taurus and spoke with Frank. Shjuan then drove Towns and Phillip toward Third Street. Shjuan turned right onto Third Street, and Jamie Neely pulled up beside them in his purple Cutlass. Phillip said Neely, who also had attended the party, was swerving his car side-to-side. After Shjuan, Towns, and Phillip arrived at Shjuan's grandmother's house, they stood in the yard. They saw Frank's car, and Frank parked and spoke with them. As they were talking, they saw Neely's car, and someone in Neely's car started shooting a gun. Phillip said that everyone scattered and that the shooting lasted fifteen to twenty-five seconds. Phillip did not see Towns with a gun or see Towns shoot back at Neely's car. He stated that he did not call the police.

Shjuan "Sassy" Thomason, Towns' younger brother, testified that in September 2003, he was living with his grandmother. Towns was living "back and forth from our house and staying with his girlfriend." On September 27, 2003, Shjuan drove Towns and Phillip Jordan to Karen Kelly's party. Shjuan was inside the house eating when he saw everyone walk toward the front yard, and he walked to his car. Shjuan, Towns, and Phillip got into Shjuan's car, and he drove from Airview Road to Third Street. They saw Jamie Neely's purple Cutlass on Third Street swerving back and forth, but Shjuan did not pay any attention to it and drove straight to his grandmother's house. After they arrived, they saw Neely's car driving down the street. Shjuan heard gunshots, and everyone scattered. He stated that he did not see Towns leave his grandmother's house that night, that Towns had never been "stocky," and that he did not want Towns to go to jail.

On cross-examination, Shjuan testified that he walked to his car after the party ended and that Towns was "out there in the crowd for a second." He acknowledged that he did not know where

---

[2]Because some of the witnesses in this case share a surname, we have chosen to utilize their first names for clarity. We mean no disrespect to these individuals.

Towns was during that time. He also acknowledged that he did not call 911 after the shooting and that he never told the police Towns had been with him on the night of September 27. He said he never spoke with the police because he thought Towns' lawyer "was going to take care of most of the legal business."

Gail Jordan testified that she lived across the street from Towns' grandmother. On September 27, 2003, Gail looked outside about 10:00 p.m. and saw Towns, Phillip Jordan, and Shjuan Thomason in the yard. Sometime between 11:00 p.m. and midnight, she heard about six gunshots and ran to the door. She looked outside and saw three cars drive by Leola Towns' house, including a dark-colored Cutlass. Gail saw Towns outside after the shooting and did not see anyone with a gun. On cross-examination, Gail testified that she saw shots fired from the Cutlass. She acknowledged that she made no effort to contact the police between September and November 2003 and that she told an investigator she "blanked out" after the shooting.

Sixteen-year-old Shenell Jordan, Gail Jordan's daughter, testified that she was sitting in the kitchen with her mother on the night of September 27, 2003, and that Towns and some other boys were sitting outside. Sometime between 11:00 p.m. and midnight, two shots were fired. She saw three cars drive by Leola Towns' house, and more gunshots were fired. She said that the first car was Jamie Neely's purple Cutlass and that the third car was a small green car full of girls. She did not see the second car. Shenell saw gunshots fired from the Cutlass' window. Shenell said Towns had never been "stocky," and she acknowledged on cross-examination that it was dark outside.

Sharon Thomason, Towns' mother, testified that on the night of September 27, Towns, Shjuan Thomason, and Phillip Jordan returned home from a party. About ten minutes later, a shooting occurred. Sharon ran outside and saw a purple car and a gold or tan car. She checked on Towns and Shjuan and saw Gail Jordan standing close to the street. The following week, the police came to Leola Towns' house looking for Towns. Sharon and her sisters took him to the police department so he could turn himself in. When they arrived, Towns was told there was no warrant for his arrest, so they went home. On cross-examination, Sharon testified that sometime after the shooting, Towns left his grandmother's house and went home. She stated that she did not see Towns with a gun that night.

Twenty-three-year-old Shurrod "Nuddy" Towns testified that his appearance had not changed much in the past five years and that he had never been "stocky." In September 2003, he was living "back and forth" between his grandmother's house, his aunt's house, and his girlfriend's house. He also was employed full time at Jabil Circuit. On the night of September 27, 2003, Towns went to a party with his brother, Shjuan Thomason. Towns wore a black Nike t-shirt. Towns, Phillip Jordan, and Shjuan rode to the party in Shjuan's car, a beige Cutlass with a blue quarter top. Frank, who was Towns' good friend, and two other males followed in Frank's car. Towns did not know the two males riding with Frank, but one of them was nicknamed "Black." Two males nicknamed "Lil' Buck" and "Cain" followed Frank in a third car. After the party ended, everyone started walking toward the street, and Towns spoke with Miguel Johnson. While they were talking, "a little light skinned guy" hit Johnson on the head.

Towns testified that he walked to Frank's car and spoke with Frank. He did not see a blue Buick. Towns, Shjuan, and Phillip got into Shjuan's Cutlass, and Shjuan drove to the intersection of Airview Road and Third Street and turned right onto Third Street. Towns did not get out of the car at the intersection. During the drive to Leola Towns' house, they saw Jamie Neely's car, "but [it] wasn't a big deal." After they arrived at Leola Towns' home, Towns saw Frank drive down the street. Frank parked his car and spoke briefly with Towns. Towns saw Neely's car and a second car following Neely. He did not see a gun but heard gunshots and ran. About an hour after the shooting, Towns left his grandmother's house and went to his girlfriend's house. About one and one-half weeks later, he learned the police were looking for him. Towns and his two aunts went to the police department and spoke with a woman at the front desk. The woman made a telephone call, told Towns the police did not have a warrant for him, and told Towns he was free to leave. About one week later, Towns and his mother returned to the police department. The police still did not have a warrant for his arrest, so he went home. He said he did not kill Alandro Shinault.

On cross-examination, Towns testified that he did not know Shinault and was not sure if he saw Shinault at the party. When Towns, Shjuan, and Phillip left the party, Frank's car was not behind them. After the shooting at his grandmother's house, he did not telephone the police.

The jury convicted the appellants of the first degree murder of Alandro Shinault and the attempted first degree murders of Jamie Neely, Marchello Kuykendall, Andrew Perkins, Princeton Smith, and Antuan Todd.

## II. Analysis

### A. Sufficiency of the Evidence

The appellants contend that the evidence is insufficient to support their convictions. Frank argues that the evidence is insufficient because the proof at trial showed Shurrod Towns was in front of the Kellys' home and threatening the occupants of Alandro Shinault's Buick at the same time Towns and Frank were supposed to be chasing Jamie Neely's purple Cutlass. In addition, he notes that no one in the Buick was able to identify him from photographic arrays soon after the shooting and that the defense presented numerous witnesses to counter the victims' testimony. Towns argues that the evidence is insufficient because the medical examiner testified that the gun was four to six inches away from Shinault's head when it was fired, which was physically impossible, and because "the identification testimony is wholly speculative and unreliable." The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value

to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Taken in the light most favorable to the State, the evidence established that the appellants walked to the Taurus after the party and that Alandro Shinault and his friends walked to the Buick. Towns approached the Buick and asked the five males if they had a problem with the Bloods. They said no, and someone pulled Towns away from the car. Shinualt drove to Third Street, and the Taurus pulled up beside him. Towns got out of the Taurus to approach the Buick, and Shinault turned right from Airview Road onto Third Street. The Taurus pursued the Buick and blocked it at Tully Road, forcing Shinualt to turn left onto Tully. The appellants got out of the Taurus and began shooting at the Buick, striking Shinault in the head. Andrew Perkins identified one of the appellants, Towns, from a photographic array soon after the shooting. Marchello Kuykendall testified that Towns was sitting in the front passenger seat of the Taurus, and Princeton Smith testified that Frank was driving. The defense pointed out to the jury that Kuykendall, Smith, and Antuan Todd were unable to identify the appellants from photographic arrays. Nevertheless, the jury, as was its prerogative, chose to accredit the victims' identifications of the appellants as the shooters.

As for Towns' argument that it was physically impossible for Shinault to have been shot from only four to six inches away, Towns has misconstrued the medical examiner's testimony. Dr. Chancellor did not testify that the gun was only four to six inches away from Shinault when it was fired. Instead, she testified that no soot or stippling was found on Shinault. The defense then asked her to estimate "the closest you think this gun could have possibly been to the victim," and she stated that the gun "could have been as close as six inches, maybe four inches from the body, again, depending on the particular gun and ammunition used." Although the gun could have been as close as four to six inches away from Shinault when it was fired, it also could have been much farther away. We find no merit to Towns' claim that it was physically impossible for Shinault to have been killed in the manner the victims described.

Regarding the appellants' convictions for the attempted murder of Jamie Neely, Neely testified that the appellants shot at him on Double Tree Road. He also picked out their photographs from photographic arrays soon after the shooting. The jury heard the defense witnesses but chose to accredit the testimony of the State's witnesses. The evidence is sufficient for a rational trier of fact to find the appellants guilty beyond a reasonable doubt of the attempted first degree murder of Neely.

Frank contends that he could not be guilty of the crimes because the testimony reflects that the appellants were chasing and assaulting Neely at the same time as they supposedly were shooting at Shinault, Kuykendall, Perkins, Smith, and Todd on Tully Road. However, in Frank's statement to the police, he stated that after the party, he and "Lil' Buck" exchanged words with the occupants

-11-

of a blue car at the intersection of Airview Road and Third Street. He also stated that he and Lil' Buck beat up a male in a yard. Thus, Frank's statement gives credibility to the victims' testimony. We acknowledge that the time line of the night's events is less than clear. However, conflicts in the trial testimony must be resolved in favor of the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The evidence is sufficient to support the convictions.

## B. Denial of Preliminary Hearing

Towns argues that the trial court erred by denying his motion to dismiss the indictments because he was denied his right to a preliminary hearing. The State contends that the trial court properly denied Towns' motion to dismiss because Towns was indicted before he was arrested and, therefore, was not entitled to a preliminary hearing. We agree that the appellant was not entitled to a preliminary hearing.

Tennessee Rule of Criminal Procedure 5(e) provides as follows:

> Any defendant arrested prior to indictment or presentment for a misdemeanor or felony, except small offenses, is entitled to a preliminary hearing on request, whether or not the county grand jury is in session. If the defendant is indicted while the preliminary hearing is being continued (whether at the defendant or prosecutor's request) or at any time before he or she has been afforded a preliminary hearing on a warrant, the defendant may dismiss the indictment on motion. No such motion to dismiss shall be granted after more than thirty days from the date of the defendant's arrest.

This court has stated that a defendant is not entitled to a "post-indictment determination of probable cause by a magistrate, a determination already made by the grand jury." State v. Lawson, 794 S.W.2d 363, 366 (Tenn. Crim. App. 1990). In Moore v. State, 578 S.W.2d 78, 82 (Tenn. 1979), our supreme court created an exception to the thirty-day rule announced in the last sentence of Rule 5(e), stating that the thirty-day time limitation applies "only when all parties--including the defendant, who must act promptly--have acted in good faith and in compliance with the statute. The failure of the court or the prosecution to exercise good faith and to abide [by] the law operates to toll the statute and preclude its invocation."

On October 7, 2003, a warrant was issued in the general sessions court for Towns' arrest, but he was not arrested at that time. On February 24, 2004, a Shelby County grand jury indicted him for the crimes. The next day, the criminal court issued a capias for Towns' arrest, and the police arrested him on February 26, 2004. The October 7, 2003 arrest warrant was stamped and filed on February 26, and Towns appeared in general sessions court on February 27. According to Towns' motion to dismiss the indictments, "[w]hat transpired in General Sessions Court on February 27 is unclear . . . but that case was eventually dismissed and the accused was later brought before the Honorable Judge in Criminal Court Division IV." Towns filed a motion to dismiss the indictments on April 27, 2004.

-12-

At the hearing on the motion, the defense argued that Towns was arrested in February 2004 on the October 7, 2003 warrant, that the prosecution of the case began with his arrest on that warrant, and that he was entitled to a preliminary hearing. The defense also argued that the appellant made a good faith effort to turn himself in prior to being indicted and that the police could have easily arrested him on the warrant. Instead, the State indicted the appellant, depriving him of his right to a preliminary hearing. The defense requested that the trial court hold a preliminary hearing for the appellant. The State argued that the police made a good faith effort to find and arrest the appellant on the warrant and that the appellant failed to show bad faith by the State. The State also argued that because the appellant was indicted before he was arrested, he was not entitled to a preliminary hearing.

Felicia Towns, the appellant's aunt, testified that about the first week in October 2003, the police came to her home. They were looking for the appellant, but he was not there. That same evening, she took the appellant to the police department "jail annex" to turn himself in. Felicia spoke with a young female deputy "right there when you get ready to walk through" and gave her the appellant's name and birth date. The deputy used the telephone, called someone upstairs, told the appellant that the police did not have a warrant for his arrest, and told the appellant that he could go home. About three weeks later, the police returned to Felicia's apartment and asked if she had seen the appellant. Later, Felicia and the appellant returned to the police department. Once again, the female deputy said there was no warrant for his arrest.

On cross-examination, Felicia testified that she thought the police first came to her apartment prior to October 7. At that time, they only wanted to talk with the appellant. She acknowledged that she took the appellant to the jail annex that same evening and that there would not have been a warrant for his arrest at that time. She stated that when the police arrested the appellant in February 2004, he was living at his girlfriend's house.

The appellant testified that in October 2003, he and his aunt went to the jail annex building to turn himself in to police. He walked through the security scanners and spoke with a woman. The woman asked for his name and birth date, and he gave her the information. She made a telephone call and told the appellant there was no warrant for his arrest. The appellant went home but returned to the jail annex a couple of weeks later because the police had returned to his aunt's home and were looking for him. Once again, the appellant was told that the police did not have a warrant for his arrest and that he could go home. From October 2003 until he was arrested in February 2004, the appellant worked full time at CSI and then Jabil Circuit and lived back and forth between his aunt's house and his grandmother's house. He also spent some nights with his girlfriend. Sometime in October 2003, the police went to his aunt's and his grandmother's houses and left messages for the appellant to call them. After the appellant tried to turn himself in, the police did not try to contact him. The appellant said he did not hide from the police.

On cross-examination, the appellant testified that he was at his girlfriend's house when the police arrested him. He said he did not know the name of the female deputy he spoke with at the jail annex.

Deborah Owen of the Shelby County District Attorney General's Office testified for the State that she was asked to investigate whether any evidence existed to show the appellant tried to turn himself in to the Memphis police between October 7, 2003, and February 2004. She contacted the homicide bureau, the general assignment bureau, and the fugitive bureau. Employees at the homicide and fugitive bureaus told her that if the appellant had come in, "they would have held on to him until they found something to confirm or deny whether he was wanted." No one at either bureau remembered anyone coming in with the name "Shurrod Towns." Employees at the general assignment bureau told Owen that if the appellant had come in during daylight hours, they would have sent him to the homicide bureau. If he had come in after 4:00 p.m., they would have "sent him to felony response who would have sent him to fugitive." Owen said that the fugitive bureau was located in the jail annex and that there was no evidence the appellant tried to turn himself in to the fugitive bureau.

On cross-examination, Owen acknowledged that she did not speak with anyone at the front desk in the jail annex building. She also acknowledged that scanners and an information desk were in the front of the building.

In a written order, the trial court stated that although the appellant made a good faith effort to turn himself in, he was not arrested on the warrant until after the trial court issued the capias pursuant to the indictment. The trial court held that the prosecution of the case began when the capias was issued and, therefore, that a preliminary hearing was not required. Furthermore, the trial court stated that a preliminary hearing was not required in this case because the appellant filed his motion to dismiss on April 27, 2004, sixty days after his arrest, and because the appellant failed to show bad faith by the State. The trial court denied the appellant's motion to dismiss.

The appellant argues that he was denied his right to a preliminary hearing and that the thirty-day limit on the motion to dismiss should not apply because the State acted in bad faith. We disagree. For whatever reason, the State elected not to dismiss the arrest warrant before the State submitted the case to the grand jury. Regardless, the grand jury determined that probable cause existed to charge the appellant with the crimes. Although the warrant for the appellant's arrest was issued before the grand jury returned the indictments, the appellant was not arrested until the trial court issued the capias pursuant to the indictments. Rule 5(e), Tennessee Rules of Criminal Procedure, clearly states that a preliminary hearing is not required when the defendant is indicted prior to his arrest. Therefore, we agree with the trial court that the appellant was not entitled to a preliminary hearing. Moreover, we are not persuaded by the appellant's argument that the State acted in bad faith. Therefore, the appellant is not entitled to relief.

C. Motion for Mistrial

Towns contends that the trial court erred by denying his motion for a mistrial when Sergeant Merritt stated during his testimony that the appellant had an arrest record. The State argues that the trial court properly denied the appellant's motion for a mistrial. We agree with the State.

During Sergeant Merritt's direct testimony for the State, he said that he received the

nicknames of some potential suspects and that a co-worker told him the real name of one of the suspects was Shurrod Towns. Sergeant Merritt said that he entered Towns' name into a database to determine if anyone with that name had an arrest record and that "I was able to locate a Shurrod Towns that had been arrested. It was about the same age of the person that was described by the witnesses." Sergeant Merritt said he assembled a photographic array that included Towns' photograph, and the defense requested a bench conference. During the conference, Towns requested a mistrial, arguing that he had been prejudiced by the jury's learning he had an arrest record. Regarding a curative instruction, defense counsel stated, "I don't know if a curative instruction is what the Court wants to do." The State argued that Sergeant Merritt's testimony did not warrant a mistrial, and the trial court agreed, concluding that although Sergeant Merritt's statement was "somewhat prejudicial, I do believe that it was said in such a way that many of the jurors did not really focus on it." The court also decided not to give a curative instruction because it believed the instruction would draw more attention to the officer's statement.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

While Sergeant Merritt's testimony was improper, we do not believe a miscarriage of justice resulted from the trial court's failure to declare a mistrial. There is nothing in the record that indicates the State intentionally elicited the testimony, and the State's case was strong. The trial court decided it was best to not give a curative instruction. The defense apparently did not want an instruction and did not request one. We conclude that the appellant is not entitled to relief.

## D. Newly Discovered Evidence

Towns contends that the trial court erred by denying his motion for a new trial based upon newly discovered evidence. Specifically, he argues Jamie Neely's girlfriend, Dynasty Page, admitted in a post-trial affidavit that she was with Neely when the shooting occurred on Double Tree Road and that she did not see Towns shoot at Neely. The State contends that the trial court properly denied the appellant's motion. We agree with the State.

In the appellant's motion for a new trial, he alleged the following: The defense interviewed Dynasty Page prior to trial. During the interview, she said that she had witnessed part of the assault on Neely but that she was not with him during the shooting on Double Tree Road. After the appellants' trial, Page wrote a letter to the trial court in which she claimed she had lied about her knowledge of the events and wanted to clarify what she knew. She also alleged in the letter that "the boy who shot at us was light-skinned and I had never seen him before. It couldn't have been Shurrod

-15-

Towns because I know him, he went to school with me." The trial court forwarded the letter to the defense, and the defense interviewed Page again. In the second interview, Page admitted that she was in the car with Neely during the shooting and that the shooter "was specifically and definitely not Shurrod Towns." The appellant attached to his new trial motion Page's handwritten letter to the trial court, a transcript of the defense's post-trial interview with Page, and an affidavit in which Page again stated that she saw the shooter and that the shooter was not Shurrod Towns.

At the motion for new trial hearing, the defense informed the trial court that Neely had told the police prior to trial that Page was not with him. Therefore, the defense was surprised when Neely testified at trial that Page was with him on Double Tree Road. The defense argued that the trial court should grant the appellant's motion for a new trial based upon newly discovered evidence because the defense had used reasonable diligence to interview the witnesses and discover the evidence. The defense also argued that Page's information was very material to the case and that Page's testimony probably would change the result of the trial. The State claimed that Page's information was not new evidence because the defense interviewed her prior to trial and took a statement from her. The State noted that although Neely admitted during the trial that Page was with him at the time of the shooting, the defense chose not to request a continuance in order to "get Ms. Page here to the court." Finally, the State claimed that Page's information did not warrant a new trial because her testimony would only impeach Neely's testimony and because Page was not credible. The defense informed the trial court that Page was in the courtroom and could be questioned. However, neither the State nor the defense called her to testify at the motion for new trial hearing.

In a written order, the trial court concluded that the defense used reasonable diligence to discover the information prior to trial. However, the trial court agreed with the State and concluded that Page's testimony would only impeach Neely and would not change the outcome of the trial because there was "substantial direct and circumstantial evidence" to find the appellant guilty. The trial court denied the appellant's motion for a new trial.

This court has previously observed that the decision to "grant[ ] or den[y] a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge." State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). Accordingly, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Meade, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996). It is the law of this state that

> a trial court should grant a defendant a new trial on the basis of newly discovered evidence when [(1)] the defendant has been reasonably diligent in obtaining evidence, [(2)] the materiality of the new evidence is apparent, and [(3)] the evidence is likely to change the result [of the trial]. It is true that newly discovered impeachment evidence will not constitute grounds for a new trial, as a general rule. But if the impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal, a new trial may be ordered.

-16-

State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993) (citations omitted). All three prongs of the aforementioned test must be met before an appellant is entitled to a new trial based on newly discovered evidence. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994). This court has also observed that a new trial will not be granted on the basis of newly discovered evidence when such evidence will serve only to impeach a witness. See State v. Arnold, 719 S.W.2d 543, 550 (Tenn. Crim. App. 1986).

> A new trial will not be granted on newly discovered evidence where it appears that such new evidence can have no other effect than to discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness, unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness [was] so strong and convincing that a different result at trial would necessarily follow.

State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985). "Where evidence tends only to contradict or impeach the trial evidence, a new trial based on such alleged newly discovered evidence is not warranted." State v. LeQuire, 634 S.W.2d 608, 615 (Tenn. Crim. App. 1981).

We conclude that the trial court did not abuse its discretion by denying the motion for a new trial. The primary purpose of Page's testimony would be to impeach Neely's testimony. Furthermore, in her post-trial interview with the defense investigator, Page stated that although she did not see Towns shoot at them, Neely told her that Towns was present and fired a second set of shots at them. Therefore, we cannot say that the "new evidence" would likely change the result of the trial.

## E. Fines

Frank contends that the trial court erred by imposing fines greater than fifty dollars against him. The State concedes that the fines were improper. We conclude that the trial court could not impose fines more than fifty dollars against either appellant.

After announcing the appellants' sentences, the trial court ordered both of them to pay a five-hundred-dollar fine for each count.[3] However, article VI, section 14 of the Tennessee Constitution provides that no fine more than fifty dollars can be assessed against a defendant "unless it shall be assessed by a jury of his peers, who shall assess the fine at the time they find the fact, if they think the fine should be more than fifty dollars." We have reviewed the jury instructions in this case, and

---

[3]We note that although the trial court announced the appellants would pay a fine for each count, only two of Franks' judgment of conviction forms show a fine was assessed. All six of Towns' judgment of convictions forms show a fine. Where there is a conflict between the judgments of conviction and the transcript, the transcript controls. See State v. Davis, 706 S.W.2d 96, 97 (Tenn. Crim. App. 1985).

the instructions only asked the jury to determine guilt or innocence. The instructions did not mention a fine. Likewise, the jury's verdicts only made findings of guilt and did not impose fines, and nothing in the record indicates the appellants waived their right to have the jury set their fines. Therefore, the trial court was without authority to assess fines more than fifty dollars, and we reduce the appellants' fines to that amount for each offense.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the appellants' convictions but reduce the appellants' fines to fifty dollars for each offense.

_____
NORMA McGEE OGLE, JUDGE